## WEST VIRGINIA PULP & PAPER CO. *v.* WILLIAM MORTON

[No. 55, October Term, 1945.]

*Decided February 6, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Horace P. Whitworth* for the appellant.

*Edward J. Ryan,* with whom was *Estel C. Kelly* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

This case comes to this Court on appeal from a judgment of the Circuit Court for Allegany County, reversing the action of the State Industrial Accident Commission.

William Morton, appellee, at the time he filed his claim for compensation with the commission, had been employed by the West Virginia Pulp and Paper Company, a corporation, appellant, continuously for a period of twenty-three years. He filed his claim with the commission in August, 1943. The injury which he sustained happened in April, 1937. The sole question in this case is whether he is barred under Section 51, Article 101, Flack's Annotated Code, 1939, which reads, in part, as follows: "That failure of an employee to file a claim for compensation within one year after the beginning of his disability shall constitute a complete bar to any claim under this Article, unless it shall be established that failure to file such claim was induced or occasioned by fraud, or by facts and circumstances amounting to an estoppel, in which case the claim shall be filed within one year from the time of the discovery of the fraud, or within one year from the time when the facts and circumstances amounting to an estoppel cease to operate, and not afterwards."

The appellee asserts that appellant is estopped from setting up the bar of the statute, and the contention of the appellant is that nothing was said or done by it that in any way estopped it from pleading limitation.

The controversy presented here for decision involves a question of estoppel, and if the facts in the case are legally sufficient to establish estoppel, the bar of the statute is arrested and the appellant will not be allowed to set it up to defeat the claim of the appellee. This was the sole question argued at the bar of this Court. A review of the evidence is necessary.

In April, 1937, appellee was working in the basement of one of the buildings of appellant and in the course of his work a large quantity of chlorine gas escaped from a pipe, causing serious injury to appellee. The evidence tends to show that at first the flow of the escaping gas was more or less slight, and appellee worked under this condition for some time, when the gas escaped in a large quantity and was inhaled by appellee, burning and injuring his throat, bronchial tubes, and lungs. He was taken to the dispensary and given aid by a nurse, and the doctor, hearing the conversations, examined him. He told the nurse to report it on the records and said to appellee that chlorine gas was given sometimes for colds, but that he didn't know how much chlorine gas was inhaled by appellee. Appellee went back to his work, but did not work because unable to do so, and when he returned home that day he didn't return to work for six weeks. When he returned Dr. Bess examined him and he went back to work. The evidence in the case tends to show that from that time on appellee's health progressively deteriorated and he left the employment of the company in August, 1943, because his condition was such that he was unable to work.

When he returned to work, after being absent for six weeks, he reported to his boss, Mr. Richards, what happened to him, and Richards reported the matter to Frank Borgas. Frank Borgas was the department superintendent, and the evidence tends to disclose he had control of Richards, who was appellee's boss, and the men who worked under him, including appellee. Appellee testified Borgas told him: "Well now listen, Billy * * *

under this condition, you have worked here for a long time. * * * We don't want to lose you. We do want you to stay on the job. * * * If you ever find out any place that it don't agree with you, * * * you give my office a buzz, and I will see that you are taken from that job and we will try to keep you on the job." Appellee further stated that Borgas told him: "They would take care of my claim and take care of that if any claim was to be filed." The record shows that appellee worked for appellant continuously until August, 1943. During that time he received his same rate of pay and did, in fact, receive a raise in his pay, although when he received this raise is not disclosed by the record. He did easy work, but it cannot be supposed that the work he did was not valuable to appellant. He repaired a number of ladders, fixed doors, supervised men who did heavy work. He was told to take his time, to rest, and not over-exert himself. The type of work he did, in hanging doors and changing windows, was a little bit different than he did before the accident, but lighter. He lived about a mile from the plant, and both before and for some time after the accident, he walked to and from work. The chlorine gas he inhaled affected his bronchial tubes and his lungs, and in time, as his condition became progressively worse, he lost time because he could not walk to and from work. His boss (evidently meaning Mr. Richards) told him: "If you will just come out on the job, I will stop in and fetch you to work and haul you back." "This was done for a number of times. I don't know just how long but a good while. Finally in August, 1943, that is the 12th of August, I was unable to work or do any kind of work because if I did go to stoop over to pick up anything or reach for something or try to get down, I would be exhausted and couldn't get back and would choke up so badly I couldn't do anything. Since the time of the attack, it hasn't gotten any better and my condition is worse. * * * Since August (meaning April), 1937, it appeared to be getting worse on me all of the time, from that time on until in

August, 1943, I had to quit. At that time, when I had to quit, I was making a dollar an hour. I think when I got in the gas in April, 1937, I was making seventy-three cents an hour."

There is medical evidence in the case tending to show that the appellee's condition was due to the inhalation of the chlorine gas, that his condition became progressively worse, and at the time he ceased work in August, 1943, he was totally unable to work. Appellee further testified: "The reason why I didn't file claim then was that at that time that I was still on the job and was to be taken care of, and I couldn't see where I could file a claim as long as I was receiving my same rate of pay." Appellee was asked the following questions: "Did you know who looked after compensation matters for the West Virginia Pulp and Paper Company back in 1937?" He answered: "No, I did not know exactly who it was, but I understood that the nurse took care of it. I don't know whether she does or not, but I know that before that time that * * * he is dead now."

"Q. Mr. Crist? A. Mr. Crist took care of it.

"Q. You knew that Mr. Crist looked after compensation matters for them? A. At that time, I guess.

"Q. You knew Mr. Crist was looking after compensation matters for them? A. At that time, I guess he was.

"Q. You knew Mr. Crist was living in 1937, didn't you? A. I don't know just when he died; I know he is dead.

"Q. Was Mr. Failing there at that time in the mill in the office? A. I think so.

"Q. But you didn't go to see him until 1943, about it, did you? A. That is right."

The appellee made no inquiry as to whether the claim was filed for compensation until after 1943, and it was then, according to his testimony, that he was told by Dr. Bess: "Well, my advice to you would be to take it up with the Management." "And he said that he recommended me to go to Mr. Failing and see him and get in contacts with Mr. Hooker, which is the general super-

intendent and which he never did get connections with Mr. Hooker." This was in 1943.

In *Vang Construction Co. v. Marcoccia,* 154 Md. 401, at page 406, 140 A. 712, 714, it is said: "Nor is notice of the accident equivalent to an application within the statute of a claim for compensation. The objects are not the same, one relates to an investigation of the injury and the other to the enforcement of the compensation and the notice and application differ in their respective requirements and are found in separate sections of the statute. The provision that an application be made to the commission is mandatory, and, therefore 'the fact that the employer, the insurance carrier, and the commission had knowledge of the injury will not dispense with the necessity of the application for compensation being made. The actor in the matter of the application is the dependent, or, if disqualified through infancy or incapacity, some one in his behalf. Knowledge on the part of the employer and insurer of the injury, or of even the intention of the dependent to make the application, does not relieve the actor from proceeding within the time prescribed. \* \* \* It follows as a consequence of what has been stated that the claimant was barred by the staute of limitations when she made her application for compensation. For the statute to be effective it had to be pleaded, and this was done. *Dickson [Constr. & Repair] Co. v. Beasley,* 146 Md. 568, 572, 126 A. 907."

The period of limitation, by the express terms of Section 51 of Article 101, *supra,* is not effective if the failure to file the claim in time was "induced or occasioned by fraud, or by facts and circumstances amounting to an estoppel." What will or will not amount to an estoppel was fully pointed out in an opinion of this Court by Judge Mitchell, in the case of *Parks & Hull Appliance Corp. v. Reimsnyder,* 177 Md. 280, 292-293, 9 A. 2d 648, and need not be repeated here.

The evidence shows that the injury sustained by the appellee by the inhalation of the chlorine gas was not a

latent injury unknown to him, but, on the contrary, was an acute and painful injury of which he was fully conscious. It was mandatory upon him, therefore, to file his claim for compensation with the commission within one year from the date of the injury, which occurred in April, 1937. He did not do this, but delayed in filing his claim until six years after the injury occurred. His contention is that he was lulled into a state of security because of his continuing to work for appellant; being paid his salary from date of injury; the kind treatment accorded him by his employer in giving him light work; the payment of the same wages as he received before the accident; and at the time he ceased to work for the appellant he was paid a higher wage than he had received before the accident. This, added to the statement of Borgas, constitutes the grounds for his assertion that the appellant is barred or estopped from setting up the defense of limitations in this case. Many cases have been cited by the appellant and the appellee, but we are concerned in this case with the power or authority vested by the appellant in Borgas, to promise the appellee not only work as long as he was able to work, but when he was unable to work, notwithstanding the lapse of time intervening, he would be allowed compensation. The effect of the appellee's testimony of what Borgas told him, is that he would be given light work, receive his regular pay as long as he was able to work, that Borgas would see to it that his claim was filed with the commission and when he was unable to work he would receive compensation. If Borgas had the authority to bind appellant in such an arrangement with the appellee the case of estoppel would undoubtedly be much stronger. But if Borgas did not have such authority the question arises, can an agent of a corporation, without authority, make a statement to an employee regarding the filing of a claim for compensation which will constitute in law an estoppel, under the circumstances of this case?

Appellee was a carpenter and worked with a gang of men whose foreman was one Richards. These workmen and the foreman under whom they worked were under the control of Borgas, who was superintendent in that department of the appellant's operations. In the same building, on the day of the accident, there was an official of the appellant who had charge of all matters pertaining to claims of injured workmen. While the appellee's testimony in regard to this fact is equivocal, we are of opinion that it shows he knew of such official and that he was there at the time of the accident to appellee to receive reports of accidents and handle the same for the company regarding compensation to injured workmen. Witness first said he thought the nurse took care of it, but there is no evidence in the record to justify him in so thinking, and in the same answer in which he said that he thought the nurse took care of it, he said he didn't know whether she did or not, but he knew before that time that a man by the name of Crist took care of compensation matters for the appellant. When asked the direct question, if he knew that Crist looked after compensation matters for the appellant, he answered: "At that time, I guess." The question was repeated to him, and again he answered: "At that time, I guess he was." He stated that he didn't know when Crist died. He was then asked: "Was Mr. Failing there at that time in the mill in the office?" And his answer was: "I think so." He didn't go to see Mr. Failing until 1943. From this evidence given by the appellee it is perfectly apparent that on the day that he was injured he knew that there was an official in the building where he was injured to whom workmen reported concerning claims arising out of injuries received in the course of their employment. He worked for appellant for years before April, 1937, when he was injured, and he must have known, even before the accident, that the company maintained an official to whom workmen could go to make complaints concerning injuries received in

the course of their employment. Knowing this, the inference is clear that he knew or should have known that Borgas, who was superintendent of the carpenters, had no authority to make the promise which he testified Borgas made to him, and which constitutes the sole ground on which to base the doctrine of estoppel in this case.

We realize that the Workmen's Compensation Act should be liberally construed to effectuate its general purpose, but we do not think that it was the intention of the Legislature, in enacting the same, that the ordinary rules of law governing principals and agents should be dispensed with in compensation cases. It needs no authority for the statement that an agent of a corporation can only bind his principal within the scope of the authority delegated to the agent, or in cases where the doctrine of apparent authority applies. In this case the doctrine of apparent authority cannot possibly apply, because the appellee knew at the time Borgas made the promise to him, which is relied upon, that Borgas did not handle matters of compensation for the appellant. If we recognize that Borgas had the authority to make the promise that appellee testified he did make to him, then corporations and business men would be at the hazard of everything that an unauthorized agent did in compensation cases. We do not think that the Legislature of Maryland ever intended such to be the case. Since Borgas did not have the authority to make the promise to the appellee as testified to by him, such unauthorized action by the agent of the appellant cannot be set up by the way of estoppel. This being so, the judgment appealed from must be reversed and the case remanded for an order to be passed in conformity with this opinion affirming the action of the State Industrial Accident Commission.

> *Judgment reversed and case remanded for an order to be passed in conformity with this opinion.*

HENDERSON, J., filed the following dissenting opinion:

The jury found that the claimant in this case is now permanently and totally disabled because of the progressive effect of inhaling chlorine gas in the course of his employment six years ago. He could have filed a claim for temporary partial disability for the loss of six weeks following the accident, and he could probably have claimed permanent partial disability (loss of theoretical earning capacity) within a year from the time he returned to work. One reason why he did not do so was because he was receiving the same or greater wages.

I question whether the statute authorizes or requires him to file a claim for permanent total disability before it occurs. But assuming that it does, I think there was evidence in this case from which the jury could find, as they did, that the employer is estopped from setting up this defense by continuing him on the pay roll, with full knowledge of the accident and its probable effects. If authority in the superintendent to waive the filing of the claim cannot be implied, at least we may imply the authority to hire, to assign to light work, to transport to work, to increase his pay, all of which operated to lull him into a belief that filing a claim was unnecessary at that time.

I think the judgment should be affirmed.